# Exhibit B



August 4, 2010

**VIA FEDERAL EXPRESS**
Mr. Thomas Werlen
Novartis
Lichtstrasse 35
Basel 4056
Switzerland

Dear Mr. Werlen:

Re: U.S. Patent No. 5,251,294 (Abelow)

We represent Webvention, LLC; the owner of United States Patent Number 5,251,294, which is available on Webvention's website, www.webventionllc.com. The '294 patent is directed to systems and methods for organizing, presenting, and accessing information.

The inventions described by the '294 patent have been increasingly used by companies in recent years to manage and present information via the internet.. To date, 86 companies—including **American Express, Ann Taylor, Google, Hewlett Packard, Horizon Healthcare, Kimberly-Clark, Lockheed Martin, Nokia, Orbitz, Panasonic, Samsung,** and **Sears** —have chosen to license the '294 patent.

We have reviewed Novartis' website at www.thinkwhatspossible.us, and have prepared the enclosed claim chart demonstrating how the website utilizes claims 28, 37, and 40 of the '294 patent. The screen shots used in the charts are representative only. In addition to the charted claims, you should consider claims 29, 31-33, 41-44, 47, 53, 55, and 64. Depending on how the website was constructed, claims 1-8, 12-21, and 78 may also be utilized during the design and programming of the website, as well as other internal systems to organize and access information.

**The Webvention Licensing Opportunity**

Webvention's patented technology provides numerous benefits to your company, including dramatically increased ease-of-use and, in all likelihood, improvements to traditional measures of website usability and impact, such as visits, page views, time-on-site, ad clicks, and sales. The use of the technology may vary from website to website.

For the next 45 days, Webvention is willing to license the '294 patent for a one-time, fully paid-up licensing fee of $80,000.00 for a non-exclusive, company-wide right to use Webvention's technology.  The details of Webvention's license are set forth on the enclosed license agreement.

**Webvention, LLC**

Webvention is a limited liability company based in Marshall, Texas.  We have retained The Davis Firm, P.C. (www.bdfirm.com) based in Longview, Texas , to assist the company in the licensing of the '294 patent.   More information about the company can be found at www.webventionllc.com.

Sincerely,

Todd Schmidt

Todd Schmidt
todd@webventionllc.com

Enclosures (3)

Notice
Webvention Licensing LLC reserves all rights with regard to the '294 patent, including: (1) the right to seek damages anytime within the last six years that your company started to make use of Webvention's patented technology; (2) the right to change its royalty rates at any time; (3) the right to change this licensing program at any time without notice, including variance to conform to applicable laws. You should not rely on any communication or lack of communication from Webvention or The Davis Firm Group as a relinquishment of any of Webvention's rights.

505 East Travis Street        Suite 209       Marshall, Texas  75670        903.923.0758

US Patent 5,251,294 (Abelow): Novartis – Think What's Possible (pages accessed on May 7, 2010)

| Claim 28 | Exhibits |
|---|---|
| A computer-based method for aiding a user in accessing a body of stored information which includes segments of related information, the method comprising | www.thinkwhatspossible.com<br>Users can access information about Novartis – Think What's Possible and its products at its website (www.thinkwhatspossible.com/index.html) by using a computer connected to the Internet.<br><br> |
| displaying a set of labels, each label providing an abbreviated indication of information content of a corresponding one of said segments, | The webpage http://www.thinkwhatspossible.com/index.html displays a set of patient images on a panel moving across the screen. Each patient image corresponds to information related to that patient. |
| said labels being displayed in an organized model reflecting relationships among information contents of said corresponding segments, | As shown in the adjoining screen shot, the patient images are arranged under the heading "Think What's Possible." The information corresponding to the patient images relates to quotes of those patients about what is possible in overcoming illnesses. |

Subject to Revision / Federal Rule of Evidence Rule 408



A user can point to a particular patient image by moving the cursor (with a mouse, keyboard, touchscreen, etc.) over the image ("mouse over").

enabling a user to point to individual labels in said model using an electronic pointing technique, and

Subject to Revision / Federal Rule of Evidence Rule 408

| for each label to which said user points, displaying to the user, for previewing, the information content of the corresponding segment. | When the user "mouses over" one of the images, the image is enlarged and provides further information relating to that patient (quote from patient regarding an illness) for previewing. |  |
|---|---|---|
| **Claim 37** | | |
| The method of claim 28 wherein said body of stored information is available on-line from a remote location. | The information discussed above is available on-line to users, which is how these screen shots were obtained. | |
| **Claim 40** | | |
| The method of claim 28, further comprising displaying said set and said segments in windows. | As shown above, the segments of information are displayed in windows. | |

**Subject to Revision / Federal Rule of Evidence Rule 408**



US005251294A

# United States Patent [19]

## Abelow

| | |
|---|---|
| [11] Patent Number: | **5,251,294** |
| [45] Date of Patent: | Oct. 5, 1993 |

[54] ACCESSING, ASSEMBLING, AND USING BODIES OF INFORMATION

[76] Inventor: Daniel H. Abelow, 71 W. Pine St., Newton, Mass. 02166

[21] Appl. No.: 476,931

[22] Filed: Feb. 7, 1990

[51] Int. Cl.⁵ .................................... G06F 15/62
[52] U.S. Cl. ..................................... 395/155; 395/148
[58] Field of Search ............... 364/518, 519, 521, 523; 395/144–148, 155–161

[56]                References Cited

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,656,603 | 4/1987 | Dunn | 364/900 |
| 4,813,013 | 3/1989 | Dunn | 364/900 |
| 4,823,303 | 4/1989 | Terasawa | 364/521 |
| 4,885,704 | 12/1989 | Takagi et al. | 364/518 X |

OTHER PUBLICATIONS

"OnLine Information", *PC Computing*, Nov. 1988, pp. 208–210.
"Dialog and the Online Industry", from Dialog Information Services, Inc., Overview '87/'88, 1988, pp. 4–5.
"Dialog on Disc", from Dialog Information Services, Inc., Overview '87/'88, 1988, pp. 12–13.
Ulrich's International Periodicals Directory 1987–1988 (1988), New York: R. R. Bowker Company, pp. 1779–1816.
Janal, Dan, "Articles at Your Fingertips", *Online Today*, Jan. 1988, pp. 10–11.
Conroy, Cathryn, "News You Can Choose", *Online Today*, Jan., 1989, pp. 16–21.
Conroy; Cathryn, "Online Lifeline", *Online Today*, May 1986, pp. 14–18.
Johnston, Stuart J., "Moore Vendors Offering Bulletin Board Support", *Info World*, Apr. 11, 1988, vol. 10, #24, p. 33.
Dickinson, John, "Lexical Electronic Filing", *PC Magazine*, vol. 4, #17, Aug. 20, 1985, pp. 137–144.
Witten, Ian H. and Bramwell, Robert, "A System for Interactive Viewing of Structured Documents", Communications of the ACM, Mar. 1985, vol. 28, #3, pp. 280–288.
Hiltz, Starr Roxanne and Turoff, Murray, "Structuring

Computer Mediated Communication Systems to Avoid Information Overload", Communications of the ACM, Jul. 1985, vol. 28, #7, pp. 680–689.
Blair, David C. and Maron, M. E., "An Evaluation of Retrieval Effectiveness for a Full-Text Document Retrieval System", Communications of the ACM, Mar. 1985, vol. 28, #3, pp. 289–299.
Dionne, Richard J., "Science Libraries at a Crossroads", American Scientist, May–Jun. 1988, vol. 76, #3, pp. 268–272.
"Marketing Tools Alert", American Demographics, Spring 1988, pp. 1–19.

(List continued on next page.)

*Primary Examiner*—Heather R. Herndon
*Attorney, Agent, or Firm*—Fish & Richardson

[57]                ABSTRACT

An interactive information environment for accessing, controlling, and using information. Using a computer, available sources of information are accessed, and components are extracted, labeled, and formed into discrete units called contexts. A user selects and rearranges context labels and their associated contents. Contexts are selected and combined into new information structures called alternates, which are combinable with contexts into preferred situations. The preferred situations in turn are combinable with the foregoing components into meta-situations. All components have labels; labels and their associated contents are interchangeably movable and copyable at the levels of these information structures, whether they are located locally or remotely, and the information structures are combinable. While a label is invoked and manipulated, its contents or description is simultaneously displayed. Each information structure can be rearranged into one or more models which can be displayed by user selection, and models can be displayed at varying levels of detail. With built-in copyright accounting, commercial control remains with information owners, while operational use is centralized in each user.

78 Claims, 225 Drawing Sheets



5,251,294

Page 2

## OTHER PUBLICATIONS

Miller, Michael J., "Sophisticated Text-Retrieval Program Offers Hotlinks, Keyword Outlining", *Info World*, Feb. 29, 1988, p. 43.

Mace, Scott, "Ask Sam, Version 4.0 Incorporates Hypertext", *Info World*, Feb. 22, 1988, vol. 10, #8, p. 23.

Johnson, L. J., "Fast Text Searches", *PC Resource*, Dec. 1987, pp. 21–26.

Ponting, Bob, "Opus One Database Gets New Drawings Capabilities", *Info World*, Jun. 13, 1988, p. 13.

Johnston, Stuart J., "Multimedia Database Publishing Utility Ship", *Info World*, Aug. 18, 1988, #32, p. 17.

Linklider, Tracy Robnett, "Stalking the Elusive File", *BCS Update*, vol. 12, #5, May 1989, pp. 14–16.

Mace, Scott and Johnston, Stuart J., "Census Bureau Offers Information on CD ROM", *Info World*, Jul. 4, 1988, vol. 10, #27, p. 18.

Ponting, Bob, "HP's CD ROM Interface Offers Search, Organization Features", *Info World*, Aug. 8, 1988, vol. 10, #32, p. 23.

Heigerson, Linda W. and Meyer, Fred P., "CD-ROM Publishing Strategies", PC Tech Journal, Oct. 1988, vol. 6, #10, pp. 53–63.

"Language Learning", Philips International, Inc., Compact Disc-Interactive. New York: McGraw Hill Company, 1988, pp. 70–73.

"CD-I Technology", Philips International, Inc., Compact Disc-Interactive, New York: McGraw Hill Company, 1988, pp. 78–83, 86–107.

"Design Process", Philips International, Inc., Disc-Interactive, New York: McGraw Hill Company, 1988, pp. 52–59.

Patton, Carole, "Ten X Unveils Two Secure Optical Discs", *Info World*, Aug. 8, 1988, vol. 10, #32, p. 5.

Lewis, Potter H., "Like Tea or a Tango, Software for Two", New York Times, Oct. 18, 1987, III, 21:1.

Hiltz, Starr Roxanne, Online Communities, Norwood, N.J.: Ablex Publishing Corporation, 1984, pp. XV–XIV.

"Power On! New Tools for Teaching and Learning", U.S. Congress Office of Technology Assessment, 1988, pp. 232–236.

Sommer, Daniel, "Authoring System Lets Trainers Create Instructional Software", *Info World*, May 23, 1988, p. 26.

Jones, Robert Snowden, "Exhibits's PCs Inform and Entertain", *Info World*, May 2, 1988, p. 43.

Lewis, Potter H., "Like Tea a Tango, Software for Two", New York Times, Oct. 18, 1987, III, 21:1.

Hiltz, Starr Roxanne, Online Communities, Norwood, N.J.: Albex Publishing Corporation, 1984, pp. XV–XIV.

Leonard-Barton, Sviokla, Dorothy and John J., "Putting Expert Systems to Work", Harvard Business Review, Mar.–Apr. 1988, vol. 88, #2, pp. 91–98.

Svoikla, John, "Business Implications of Knowledge—Based Systems", Data Base, Fall 1986, vol. 18, #1, pp. 5–16.

Newquist, Harvey P., "An Then There was the Wine Advisor . . . ", AI Expert, Jun. 1988, vol. 3, #6, pp. 67–69.

Glascow, Barry and Elizabeth Graham, "Rapid Prototyping Using Core Knowledge Bases", AI Expert, Apr. 1988, vol. 3, #4, pp. 26–36.

"There's A Dimension to Productivity That You've Never Been Able to Address . . . Until Now", Texas Instruments, Jun. 15, 1988.

Gantz, John, "The Apple Party Line: Hypercard is the Applications Generator of the Future", *Info World*, Oct. 5, 1987, vol. 9, #40, p. 49.

Flynn, Laurie, "Arthur Young to Challenge CD-ROM Frontier", *Info World*, Mar. 21, 1988, p. 39.

Flynn, Laurie, "Cornell Med School Uses Hypertext Net!", *Info World*, Oct. 26, 1987, p. 45.

Shephard, Susan J., "AI Meet Hypertext: Knowledge and Knowledgemaker", Nov.–Dec. 1987, Reprinted Article Distributed by Knowledge Garden, Inc.

Johnston, Stuart J., "Owl Unveils Hypertext Document Manager", *Info World*, Apr. 4, 1988, p. 27.

Main, Jeremy, "At Last, Software CEO's Can Use", Fortune, Mar. 13, 1989, vol. 119, #6, pp. 77–83.

Miller, Michael J., "Agenda and Grandview: Two New Ways to Manage Personal Information", *Info World*, Apr. 11, 1988, vol. 10, #15, p. 51.

Patton, Carole, "$189 Wordbench Helps Users Develop and Organize Ideas", *Info World*, May 9, 1988, vol. 10, #19, p. 24.

Walkenbach, John, "Pop-Up Data Base Provides Instant Access to Information", *Info World*, Aug. 8, 1989, vol. 10, #32, p. 63.

(List continued on next page.)

5,251,294

Page 3

## OTHER PUBLICATIONS

Markoff, John, "Supercomputer Pictures Solve the Once Insolvable", New York Times, Oct. 30, 1988, I, 1:1.

"Get Solutions to Complex CICS Performance Problems as Easy as 1,2,3.", Computerworld, Sep. 14, 1987, pp. 50-51.

Miller, Michael J., "Software Bridge 3.0 Solves the Problem of Exchanging Word Processing Files", Info World, May 2, 1988, p. 66.

Lantz, Kenneth, "the Prototyping Methodology: Designing Right the First Time", Computerworld, Apr. 17, 1986, vol. 20, #14, pp. 69-72.

"Precision visual's Enter/Act IUMS", Precision visuals, Inc., 1987 (first introduced).

"Cambridge Trust Company Offer Convenient Automated Teller Service . . . Easy to Use . . . And Available Whenever You Need It", Cambridge Trust Company, Mar. 1988.

Stone, Paula S., "Managers Weight Costs, Benefits of Programs", Info World, Oct. 5, 1987, vol. 9, #40, p. 51.

"Get Your Work Done Before 1991", Quarterdeck, 1988.

Mace, Scott, "National Research Net to be Enhanced in July", Info World, Apr. 25, 1988, vol. 10, #17, p. 11.

Jones, Robert Snowden, "Carbon Copy Upgrade Works in Background", Info World, May 2, 1988, p. 35.

Satchell, Stephen, "The USDV.32 Modem: High-Speed Connections at a Comfortable Price", Info World, Apr. 25, 1988, vol. 10, #17, p. 73.

Applegate, Lynda M., Cash, James I., Jr., Mills, D. Quinn, "Information Technology and Tomorrow's Manager", Harvard Business Review, Nov.-Dec. 1988, vol. 88, #6, pp. 128-136.

Runyan, Linda, "Hot Technologies for 1989", Datamation, Jan. 15, 1989, vol. 35, #2, pp. 18-24.

Dreyfuss, Joel, "Catching the Computer Wave", Fortune, Sep. 26, 1988, vol. 118, #7, pp. 78-79.

Stone, Paula, "Research Report Outlines PC Managerial Models", Info World, Jul. 4, 1988, vol. 10, #27, p. 34.

Goleman, Daniel, "Why Managers Resist Machines", New York Times, Feb. 7, 1988, III, 2:1.

Porter, Michael E. and Victor E. Millar, "How Information Gives you Competitive Advantage", Harvard Business Review, Jul.-Aug., 1985, vol. 85, #4, pp. 149-178.

Marchand, Donald and Forest Horton, Jr., "Existing Information Resources Can Give You the Competitive Edge", Computerworld, May 26, 1986, vol. 29, #21, pp. 79-84.

Brooks, Harvey and Eugene B. Skolnikoff, "Science Technology and International Relations", Paper presented at the NATO Science Committee 20th Anniversary Commemoration Conference, Cambridge, Mass. Apr. 12, 1978.

"All the World's A Dish", The Economist, Aug. 27, 1988, vol. 308, #7565, pp. 7-8.

Estren, Mark J., "Escaping the Paradigm", High Technology Business, Jul. 1988, vol. 8, #7, p. 18.

Skolnikoff, Eugene B., "Science, Technology, and International Security: A Synthesis", Science, Technology, and the Issues of the 80's, A.A.A.S, Boulder, Colo.: Westview Press, Sep. 1981, pp. 1-40.

Final Report of the Defense Science Board Task Force on Semiconductor Dependency, Washington, D.C., 1986, pp. 1-13.

Hendrickson, David C. "The Future of American Strategy", New York: Holmes and Meier, 1987, pp. 18-27.

Gansler, Jacques S., "Needed: A VS Defense Industrial Strategy", International Security, Fall, 1987, vol. 12, #2, pp. 45-62.

Pournelle, Jerry, "Low Productivity, Inadequate Education Threatens U.S. Computer Industry", Info World. Oct. 19, 1987, vol. 9, #42, p. 57.

Governing America: A Competitiveness Policy Agenda for the New Administration. A report by the Council on Competitiveness, Washington, D.C., pp. 1-43.

Zuboff, Shoshana, "New Worlds of Computer-Mediated Work", Harvard Business Review, Sep.-Oct., 1982, vol. 60, #5, pp. 142-150.

Fosnot, Catherine Twomey et al., "The Development of an Understanding of Balance and the Effect of Training Via Stop-Action Video", Journal of Applied Developmental Psychology, Jan.-Mar., 1988, vol. 9, #1, pp. 1-26.

Flavell, John H. "Cognitive Monitoring", Children's Oral Communication Skills", 1981, pp. 35-59.

Online Information, PC Computing, Nov. 1988, p. 208.

Conroy, Cathryn. "News You Can Choose", Online Today, pp. 16-19, Jan. 1989.

Conroy, Cathryn. "Online Lifeline", Online Today, pp. 14-18, May 1986.

(List continued on next page.)

5,251,294

Page 4

## OTHER PUBLICATIONS

Johnston, Stuart J. "More Vendors Offering Bulletin Board Support", Management. Apr. 11, 1988. p. 33.

Dickinson, John. "Lexical Electronic Filing", PC Magazine. Aug. 20, 1985. pp. 137–144.

Witten, I. et al. "A System for Interactive Viewing of Structured Documents" Communications of the ACM. Mar. 1985. vol. 28. No. 3. pp. 280–288.

"Structuring Computer–Mediated Communication Systems To Avoid Information Overload", Communications of the ACM. Jul. 1985. vol. 28. No. 7. pp. 680–689.

Blair, David C. and Maron M. E. "An Evaluation of Retrieval Effectiveness For a Full–Text Document Retrieval System", Communications of the ACM. Mar. 1985, pp. 289–299. vol. 28. No. 3.

Dionne, Richard, J. "Science Libraries at a Cross-roads", American Scientist, vol. 76. May 1988, pp. 268–272.

American Demographics. Spring 1988, pp. 1–19.

Mace, Scott. "Ask Sam, Version 4.0 Incorporates Hypertext", PC Magazine. Feb. 22, 1988. p. 23.

Johnson, L. J. "Fast Text Searches," PC Resource. Dec. 1987. pp. 21–26.

"Stalking the Elusive File" BCS Update. May 1989..

Pooting, Bob. "HP's CD ROM Interface Offers Search, Organization Features", Info World. Aug. 8, 1988. p. 23.

Helgerson, Linda W. and Meyer, Fred P. "CD–ROM Publishing Strategies", PC Tech Journal. Oct. 1988. pp. 53–63.

Patton, "Ten X Unveils Two Secure Optical Discs, Aug. 8, 1988.

Lewis, Peter H. "Like Tea or a Tango, Software for 2". The New York Times. Oct. 18, 1987.

Hiltz, Starr, Roxanne. Online Communities. Ablex Publishing Corporation. Norwood, N.J., 1984, pp. XV–XIV.

Leonard-Barton, Dorothy, and Sviokla, John J. "Putting Expert Systems to Work". Harvard Business Review. Mar.–Apr. 1988. pp. 91–98.

Sviokla, John. "Business Implications of Knowledge–Based Systems". Data Base. Fall of 1986. pp. 5–16.

Newquist, Harvey P. III. "And Then There Was the Wine Advisor", AI Expert. Jun. 1988. pp. 67–69.

Glasgow, Barry and Graham, Elizabeth. "Rapid Prototyping Using Core Knowledge Bases", AI Expert. Apr. 1988. pp. 26–35.

Gantz, John. "The Apple Party Line: Hypercard Is the Applications Generator of the Future", Tech Street. Oct. 5, 1987, pp. 49–50.

Main, Jeremy. "At Last, Software CEOs Can Use", Fortune. Mar. 13, 1989. pp. 77–78.

Miller, Michael, "Agenda and Grandview: Two New Ways to Manage Personal Information, Apr. 11, 1988.

Patton, Carole. "$189 Wordbench Helps Users Develop and Organize Ideas", Software. May 9, 1988. p. 24.

Walkenbach, John. "Pop–Up Database Provides Instant Access to Information", Software Reviews. Aug. 8, 1988, p. 63.

Markoff, John. "Supercomputer Pictures Solve the Once Insoluble", New York. Oct. 30, 1988.

"Get Solutions to Complex CICS Performance Problems As Easy As 1,2,3.", Computerworld. Sep. 14, 1987.

Lantz, Kenneth. "The prototyping methodology: Designing right the first time", Computer World. Apr. 7, 1986. p. 69.

Stone, Paula S. "Managers Weigh Costs, Benefits of Programs", Management. Oct. 5, 1987. p. 51.

Mace, Scott. "National Research Net To Be Enhanced in July", Working. Apr. 25, 1988. p. 11.

Satchell, Stephen. "The UDS V.32 Modem: High-Speed Connections at a Comfortable Price", Hardware Spotlight. Apr. 25, 1988. p. 73.

(List continued on next page.)

5,251,294

Page 5

## OTHER PUBLICATIONS

Applegate, Lynda M. and Cash, James I. Jr. and Mills, D. Quinn. "Information Technology and Tomorrow's Manager", Harvard Business Review. Nov.–Dec. 1988. pp. 128–136.

Runyan, Linda. "Hot Technologies for 1989", Forecast. Jan. 15, 1989. pp. 18–24.

Dreyfuss, Joel. "Catching the Computer Wave", Fortune. Sep. 26, 1988., pp. 78–79.

Goleman, Daniel. "Why Managers Resist Machines", The New York Times. Feb. 7, 1988.

Marchand, Donald and Horton, Forest Jr. "Existing Information Resources Can Give You the Competitive Edge", Computerworld. May 26, 1986. pp. 79–85.

Brooks, Harvey and Skolnifoff, Eugene B. Science, Technology and International Relations. Prepared for and delivered at the NATO Science Committee 20th Anniversary Commemoration Conference. Apr. 12, 1978.

All the World's a Dish" The Economist. Sep. 2, 1988.

Estren, Mark J. "Escaping the Paradigm", High Technology Business. Jul. 1988.

Skolinkoff, Eugene B. Science, Technology, and International Security: A Synthesis. Prepared for the Five Year Outlook project of the American Association for the Advancement of Science, Sep. 1981, pp. 1–42.

Hendrickson, David C. The Future of American Strategy. Holmes & Meier. New York, 1987. pp. 18–27.

Gansler, Jacques S. "Needed: A U.S. Defense Industrial Strategy", International Security. Fall 1987. vol. 12. No. 2. pp. 45–62.

Zuboff, Shoshana. "New Worlds of Computer-Mediated Work", Harvard Business Review. Sep.–Oct. 1982. pp. 142–150.

Fosnot, Catherine Twomey, and Forman George E. and Edwards, Carolyn Pope, and Golhaber, Jeanne. "The Development of an Understanding of Balance and the Effect of Training via Stop–Action Video". 1988, pp. 1–26.

FIGURE 1



5,251,294

61

ined in one situation may be an immediately accessible foundation for others to build related or similar information environments 1388. The Contextualizer describes a new type of information environment that expands the impact of the imagination in computing 1360. By providing an information technology to express our imaginations, and access the imaginative creations of each other, the Contextualizer offers potential new opportunities to manage what might become real and how to introduce it 1360.

As a global transformation is already developing, a growing number of companies and industries face new needs to leapfrog their current operating limits and become effective competitors on a global level, reshaping their performance, productivity, adaptation and innovation capabilities. Ultimately, this invention's goal is to help stimulate a potential Situation Shift to greater imagination-driven learning, responsiveness, and creativity, and help fill critical needs for economic growth, humanitarian progress, rapid performance, and survival. Continuous learning may be fostered at the point when better situations are imagined or even desired, with the best ideas captured in information systems, then spread rapidly to others in useful forms so they can, in turn, rapidly improve and produce and then spread their new capabilities to others.

With this invention, new and productive uses for the emerging infrastructure of information systems may be developed. This is not only a new paradigm for computing, it is potentially a systematic new way to help organizations, groups, and individuals manage and develop the increasingly complex world in which we live.

I claim:

1. A computer-based method for aiding a user in assembling a customized body of information from a larger body of available information segments, the method comprising

displaying a set of labels, each label providing an abbreviated indication of information content of a corresponding one of said available information segments in said larger body,

enabling a user to point to individual labels in said set using an electronic pointing technique,

for each label to which said user points, displaying to the user, for previewing, information content of the corresponding segment,

enabling a user to choose to include in the customized body of information, selected ones of said available information segments, while excluding from the customized body of information other available information segments, and

assembling said customized body of information in response to choices of information segments made by said user.

2. A computer-based method for aiding a user in assembling a customized body of information from a larger body of available information segments, the method comprising

displaying a set of labels, each label providing an abbreviated indication of information content of a corresponding one of said available information segments in said larger body,

enabling a user to point to individual labels in said set using an electronic pointing technique,

for each label to which said user points, displaying to the user, for previewing, information content of the corresponding segment,

62

simultaneously while displaying said information content of a segment corresponding to a label to which the user is pointing, displaying information content for a segment corresponding to a label to which the user had previously pointed.

3. The method of claim 1 or 2 further comprising simultaneously while displaying said set of labels, displaying a second set comprising an accumulation of labels to which said user has previously pointed.

4. The method of claim 3 wherein there are a plurality of available said larger bodies of information, said method further comprising

simultaneously while displaying identities of sources of said larger bodies of information, displaying for one or more of said large bodies, an associated said set of labels, said second set comprising an accumulation of said labels to which said user has previously pointed with respect to all of said larger bodies.

5. The method of claim 4 wherein one of said available bodies of information is available on-line from a remote location.

6. The method of claim 3 wherein said second set is organized in accordance with a model.

7. The method of claim 6 wherein said model comprises a hierarchy of at least two levels.

8. The method of claim 7 wherein said hierarchy comprises an outline.

9. The method of claim 6 wherein said model comprises a time sequence.

10. The method of claim 9 further comprising displaying said second set by placing each said label in a visual position which reflects its position in said time sequence relative to the visual positions of other said labels.

11. The method of claim 10 wherein said visual position comprises an indentation relative to a margin of said display.

12. The method of claim 6 further comprising, in response to a user's commands, revising the organization of said labels to modify said model.

13. The method of claim 6 further comprising compiling only the segments corresponding to the labels in said second set into said customized body of information.

14. The method of claim 6 further comprising in response to commands of a user, eliminating one of said labels and its associated contents from said model.

15. The method of claim 6 further comprising establishing multiple said models of said second set, and

displaying said models selectively to said user.

16. The method of claim 3 further comprising, in response to commands of a user, culling or reordering said labels in said second set.

17. The method of claim 3 further comprising in response to commands of a user, making either of said set and said second set selectively active to said user.

18. The method of claim 3 further comprising displaying said set, said second set, and said contents associated with said label in windows when invoked by a user.

19. The method of claim 18 further comprising altering the proportions of the display occupied respectively by said windows.

20. The method of claims 1 or 2 wherein said labels comprise textual phrases.

5,251,294

63

21. The method of claim 1 further comprising
assembling multiple said customized bodies of infor-
mation, each body being assembled by selecting
segments from a larger available body of informa-
tion segments,
assigning a name to each said customized body of
information, and
displaying said names in an organized model.

22. A computer-based method for producing an anno-
tated body of stored information comprising
specifying keys each of which may appear within said
body of stored information,
searching said body of stored information for in-
stances of each of said keys,
defining boundaries of segments of said stored infor-
mation, each said segment including at least one of
said instances,
assigning to each segment a label based on a key
found within said segment,
displaying each segment to a user,
in response to commands from said user, adjusting the
boundaries of at least one of said segments.

23. The method of claim 22 further comprising
defining said boundaries on the basis of criteria speci-
fied by said user.

24. The method of claim 22 wherein said keys com-
prise textual phrases.

25. The method of claim 22 wherein said stored infor-
mation comprises text.

26. The method of claim 22 wherein said boundaries
comprise beginnings and ends of paragraphs.

27. The method of claim 22 further comprising
in response to user commands, compiling selected
said segments and corresponding labels, each label
indicating the content of the corresponding said
segment.

28. A computer-based method for aiding a user in
accessing a body of stored information which includes
segments of related information, the method comprising
displaying a set of labels, each label providing an
abbreviated indication of information content of a
corresponding one of said segments,
said labels being displayed in an organized model
reflecting relationships among information con-
tents of said corresponding segments,
enabling a user to point to individual labels in said
model using an electronic pointing technique, and
for each label to which said user points, displaying to
the user, for previewing, the information content of
the corresponding segment.

29. The method of claim 28 wherein said model com-
prises a hierarchy of at least two levels.

30. The method of claim 29 wherein said hierarchy
comprises an outline.

31. The method of claim 29 further comprising,
in response to commands of a user, eliminating one of
said labels at a higher level of the hierarchy.

32. The method of claim 29 further comprising dis-
playing said set selectively at different levels of detail in
said hierarchy.

33. The method of claim 32 further comprising
simultaneously displaying one portion of said set at a
higher level of detail in said hierarchy, while
displaying another portion of said set at a lower level
of detail in said hierarchy.

34. The method of claim 28 wherein said model com-
prises a time sequence.

64

35. The method of claim 28 further comprising, in
response to a user's commands, revising the organiza-
tion of said labels in said set to modify said model.

36. The method of claim 28 further comprising, in
response to commands of a user, changing the content
of said labels in said second set.

37. The method of claim 28 wherein said body of
stored information is available on-line from a remote
location.

38. The method of claim 28 further comprising dis-
playing said set by placing each said label of said set in
a visual position which reflects its position in said time
sequence relative to the visual positions of other said
labels.

39. The method of claim 38 wherein said visual posi-
tion comprises an indentation relative to a margin of
said display.

40. The method of claim 28 further comprising
displaying said set and said segments in windows.

41. The method of claim 40 further comprising
altering the proportions of the display occupied re-
spectively by said windows.

42. The method of claim 28 further comprising
establishing multiple said models of said set, and
displaying said models selectively to said user.

43. The method of claim 28 wherein said labels com-
prise textual phrases.

44. The method of claim 28 wherein said set com-
prises a list.

45. The method of claim 28 further comprising pre-
venting a user from changing the order or content of
said set.

46. The method of claim 28 further comprising pre-
venting a user from changing the content of said seg-
ments.

47. The method of claim 28 further comprising alter-
ing the order or content of said set in response to user
interaction.

48. The method of claim 28 further comprising alter-
ing the content of said segments.

49. The method of claim 28 wherein one of said seg-
ments comprises another said set of labels which itself
corresponds to other segments of stored information.

50. The method of claim 49 wherein said set and said
second set comprise lists.

51. The method of claim 28 further comprising, in
response to a user's commands, revising the organiza-
tion of said labels in said set to modify said model.

52. The method of claim 28 further comprising,
in response to commands of a user, changing the
content of said labels in said second set.

53. The method of claim 28 further comprising,
in response to commands of a user, eliminating one of
said labels at a higher level of the hierarchy.

54. The method of claim 28 further comprising dis-
playing said set by placing each said label of said set in
a visual position which reflects its position in said time
sequence relative to the visual positions of other said
labels.

55. The method of claim 28 wherein said labels com-
prise textual phrases.

56. The method of claim 28 further comprising pro-
viding a marker within said range which indicates a user
selection of a label in said set.

57. The method of claim 28 wherein one of said seg-
ments comprises another said set of labels which itself
corresponds to other segments of stored information.

58. A system comprising storage containing

5,251,294

65

a body of information comprising segments,

said storage also containing

a set of labels, each label indicating the content of a corresponding one of said segments, said labels being arranged in an organized model reflecting relationships among corresponding said segments, and

software for displaying said model and for enabling a user to access a selected said segment by invoking a corresponding label in said model.

59. A computer-based method for providing assistance to a user of an application program comprising in response to a user requesting assistance in the course of using said program, displaying a set of labels, each label indicating the content of a corresponding segment of assistance information, said labels being displayed in an organized model, and simultaneously while displaying said set of labels, displaying a segment of assistance information corresponding to one of said labels selected by said user.

60. The method of claim 59 wherein said model comprises a hierarchy of at least two levels.

61. The method of claim 60 wherein said hierarchy comprises an outline.

62. The method of claim 59 wherein said model comprises a time sequence.

63. The method of claim 59 wherein said tokens comprise textual phrases.

64. A computer-based method for aiding a user to scan a set of displayed data items,

portions of said set being expressable at two levels of detail, some of said items being included at one level of detail and excluded at the other level of detail,

said method comprising displaying selected portions of said set at said different levels of detail in response to user commands,

simultaneously displaying other information, and

responding to said user by compressing or expanding the display of each item in said set to an appropriate level of detail in response to the user selecting an item in said set.

65. The method of claim 64 further comprising varying the proportions of said levels of detail in response to user commands.

66. The method of claim 65 further comprising displaying a controllable range indicator which indicates a range within said set for which said display is at said higher level of detail, and

adjusting the span of said indicator in response to user commands.

67. The method of claim 66 further comprising providing a marker within said range which indicates a user selection of a label in said set.

68. The method of claim 64 further comprising displaying a controllable range indicator which indicates a range within said set for which said display is at one said level of detail, and

adjusting the span of said indicator in response to user commands.

69. The method of claim 68 further comprising providing a marker within said range which indicates a user selection of a data item in said set.

70. A computer-based apparatus for providing assistance to a user of an application program comprising in response to a user requesting assistance in the course of using said program,

66

means for displaying a set of labels, each label indicating the content of a corresponding segment of assistance information, said labels being displayed in an organized model, and

means for, simultaneously while displaying said set of labels, displaying a segment of assistance information corresponding to one of said labels selected by said user.

71. A computer-based apparatus for aiding a user to scan a set of displayed data items while simultaneously performing another interactive task using the display, portions of said set being expressable at two levels of detail, some of said items being included at one level of detail and excluded at the other level of detail, said method comprising

means for displaying selected portions of said set at said different levels of detail in response to user commands, while

means for simultaneously displaying other information and responding to said user with respect to said other interactive task.

72. A computer-based apparatus for facilitating the organization, distribution, and use of

digital information of the kind that can be displayed by a computer, comprising

means for dividing said information into discrete segments, various segments being represented respectively by incompatible digital representational schemes,

means for providing said segments to a user in accordance with a unified digital representational scheme, means for associating with each segment a label indicative of the content of the segment,

means for collecting a set of segments that are related by subject matter,

means for organizing the labels associated with said segments in accordance with a model based on the content of said segments,

means for distributing the collected segments and model to a second user,

means for displaying the collected segments to said second user, and

means for altering the organization of the labels in accordance with a revision of said model in response to said second user.

73. A computer-based method for facilitating the organization, distribution, and use of digital information of the kind that can be displayed by a computer, comprising

dividing said information into discrete segments, various segments being represented respectively by incompatible digital representational schemes,

providing said segments to a user in accordance with a unified digital representational scheme,

associating with each segment a label indicative of the content of the segment,

collecting a set of segments that are related by subject matter,

organizing the labels associated with said segments in accordance with a model based on the content of said segments,

distributing the collected segments and model to a second user,

displaying the collected segments to said second user, and

altering the organization of the labels in accordance with a revision of said model in response to said second user.

5,251,294

67

74. A computer-based apparatus for aiding a user in assembling a customized body of information from a larger available body of available information segments, comprising

means for displaying a set of labels, each label providing an abbreviated indication of information content of a corresponding one of said segments in said available information segments in said larger body,

means for enabling a user to point to individual labels in said set using an electronic pointing technique,

for each label to which said user points, means for displaying to the user, for previewing, information content of the corresponding segment

means for enabling a user to choose to include in the customized body of information, selected ones of said available information segments, while excluding from the customized body of information other available information segments, and

means for assembling said customized body of information in response to choices of information segments made by a user.

75. A computer-based apparatus for aiding a user in assembling a customized body of information from a larger available body of available information segments, comprising

means for displaying a set of labels, each label providing an abbreviated indication of information content of a corresponding one of said available information segments in said larger body,

means for enabling a user to point to individual labels in said set using an electronic pointing technique,

means for displaying, for each label to which said user points, to the user, for previewing, information content of the corresponding segment, and

means for simultaneously while displaying said information content of a segment corresponding to a

68

label to which the user is pointing, displaying information content for a segment corresponding to a label to which the user had previously pointed.

76. A computer-based apparatus for producing an annotated body of stored information comprising

means for specifying keys each of which may appear within said body of stored information,

means for searching said body of stored information for instances of each of said keys,

means for defining boundaries of segments of said stored information, each said segment including at least one of said instances,

means for assigning to each segment a label based on a key found within said segment,

means for displaying each segment to a user, in response to commands from said user, and

means for adjusting the boundaries of at least one of said segments.

77. A computer-based apparatus for aiding a user in accessing a body of stored information which includes segments of related information, comprising

means for displaying a set of labels, each label providing an abbreviated indication of information content of a corresponding one of said segments, said labels being displayed in an organized model reflecting relationships among information contents of said corresponding segments,

means for enabling a user to point to individual labels in said model using an electronic pointing technique, and

for each label to which said user points, means for displaying to the user, for previewing, the information content of the corresponding segment.

78. The method of claim 3 wherein said set and said second set comprise lists.

* * * * *

## PATENT LICENSE AGREEMENT

This PATENT LICENSE AGREEMENT (this "*Agreement*") is entered into on
_____ (the "*Effective Date*") by and between Webvention LLC, a Texas Limited
Liability Company with an office in Marshall, Texas ("*Licensor*"), and _____, a
_____ with an office at _____ ("*Licensee*").  Licensor and Licensee shall be
referred to herein collectively as the "*Parties*," and individually as a "*Party*."

## BACKGROUND

WHEREAS, Licensor owns the Licensed Patents (as defined in Section 1.1 below)
and desires to grant a license for certain Licensed Uses (a defined in Section 1.2 below)
under the claims of the Licensed Patents.

WHEREAS, Licensee desires to obtain a release and license from Licensor under
the claims of the Licensed Patents for the Licensed Uses.

WHEREAS, Licensor is willing to provide a license and release in exchange for a
reduced Payment amount because Licensee is obtaining this release and license early in
Licensor's licensing campaign.

NOW, THEREFORE, in consideration of the above premises and the mutual
covenants of the Parties as set forth herein, Licensor and Licensee, intending to be
legally bound, agree as follows:

**1.    DEFINITIONS**

In addition to the terms defined elsewhere in this Agreement, as used in this Agreement:

**1.1**    "*Licensed Patents*" means (i) United States Patent No. 5,251,294; (ii) all patents or
patent applications claiming priority to the file date of United States Patent No.
5,251,294; and (iii) all foreign counterparts, reissues, reexaminations, extensions,
continuations, continuations in part, continuing prosecution applications, and divisions of
United States Patent No. 5,251,294.

1

**1.2**   "*Licensed Uses*" means any use of inventions claimed in the Licensed Patents, except preparing, developing, hosting, or managing websites for third parties other than Licensee and Licensee Subsidiary that are operated under that third party's brand.

**1.3**   "*Licensee Subsidiary*" means any entity that Licensee controls.  For purposes of this definition, "controls" means: (a) if Licensee has voting shares or other voting securities, ownership and control of fifty percent (50%) or more of the outstanding shares or securities entitled to vote for the election of directors or similar managing authority of such entity; or (b) if Licensee does not have voting shares or other voting securities, ownership and control of fifty percent (50%) or more of the ownership interests that represent the power to direct the management and policies of such entity. An entity shall be deemed to be a Licensee Subsidiary under this Agreement only so long as all the requirements of being a Licensee Subsidiary are met.

**1.4**   "*Territory*" means all jurisdictions in which Licensor has valid and enforceable patent rights.

**2.   LICENSE**

**2.1   Grant of License**.  Upon payment pursuant to subsection 4.1, Licensor on behalf of itself and its successors and assigns hereby grants to Licensee and Licensee Subsidiaries (and third parties accessing Licensee's website solely with respect to access to that website) a non-exclusive, non-transferable (subject to Section 10.1), non-sublicensable (subject to Section 5.3), fully paid-up irrevocable and perpetual license under the Licensed Patents solely for the Licensed Uses in the Territory.

## 3.    RELEASES

**3.1    Releases by Licensor.** Upon payment pursuant to subsection 4.1, Licensor, on behalf of itself and its successors and assigns, hereby fully, irrevocably and unconditionally releases, acquits and discharges Licensee and any Licensee Subsidiary and their respective officers, directors, agents, employees, attorneys, successors, and assigns (and third parties accessing Licensee's website solely with respect to access to that website), from any and all causes of action, claims or demands, liabilities, losses, damages, attorney's fees, court costs, or any other form of claim or compensation, known or unknown, arising out of or based on any of the Licensed Uses on or before the Effective Date (collectively, "***Licensor Released Claims***").  Notwithstanding the foregoing, this Section 3.1 shall not apply to any causes of action arising out of the breach of this Agreement by Licensee or third-party claims that are not related to the Licensor Released Claims.

**3.2    Releases by Licensee.** Upon payment pursuant to subsection 4.1, Licensee, on behalf of itself, its successors and assigns, and each Licensee Subsidiary, hereby fully, irrevocably and unconditionally release, acquits and discharges Licensor and its officers, directors, agents, employees, attorneys, successors and assigns from any and all causes of action, claims or demands, liabilities, losses, damages, attorney's fees, court costs, or any other form of claim or compensation, known or unknown, arising solely out of the Licensed Patents on or before the Effective Date.  Notwithstanding the foregoing, this Section 3.2 shall not apply to any causes of action arising out of the breach of this Agreement by Licensor or to any other claims or causes of action that are not enumerated in this Section 3.2.

**3.3    Releases.**  The releases in this Agreement include an express, informed, knowing, and voluntary waiver and relinquishment to the fullest extent permitted by law.  In this connection, the Parties acknowledge that they may have sustained damages, losses, costs, or expenses which are presently unknown and unsuspected and that such damages, losses, costs, or expenses as may have been sustained may give rise to additional damages, losses, costs, or expenses in the future.  The Parties hereto further acknowledge that they have negotiated this Agreement taking into account presently

unsuspected and unknown claims, counterclaims, causes of action, damages, losses, costs, and expenses, and the Parties hereto voluntarily and with full knowledge of its significance, expressly waive and relinquish any and all rights they may have under any state or federal statute, rule or common law principle, in law or equity, relating to limitations on general releases. The Parties voluntarily and with full knowledge of its significance, expressly waive and relinquish any and all rights they may have under any state or federal statute, rule or common law principle, in law or equity, relating to limitations on releases.

**3.4    Unknown Claims.** The Parties acknowledge that there is risk that after the Effective Date, they will discover, incur or suffer claims that are related to, or arise from facts connected with, the matters released under Sections 3.1 and 3.2 above, and arose in any way, in whole or in part, before the Effective Date, and that were unknown or unanticipated as of the Effective Date (collectively, the "**Unknown Claims**"). Nonetheless, to the extent that Licensee or Licensee Subsidiary is located or has operations in California, to the full extent permitted by applicable law, each of Licensor and Licensee hereby waives, relinquishes and discharges any and all Unknown Claims, and waives, relinquishes and discharges any and all rights it may have with respect to any Unknown Claims, including any rights provided by California Civil Code § 1542 (and similar provisions in other jurisdictions), which provides:

> **A general release does not extend to claims which the creditor does not know or suspect to exist in his or her favor at the time of executing the release, which if known by him or her must have materially affected his or her settlement with the debtor.**

**4.    CONSIDERATION**

**4.1    Payment.** In consideration of the license granted in Section 2.1, the release granted in Section 3.1, and other terms and conditions of this Agreement, Licensee shall pay Licensor a fully paid-up, non-refundable, lump-sum payment equal to three hundred thousand dollars (U.S. $300,000) ("***Payment***").  Payment shall occur within ten (10)

calendar days of the Effective Date.  Payment shall be by wire transfer to the following account:

>Wells Fargo Bank
>Webvension Licensing, LLC
>505 East Travis Street
>Suite 209
>Marshall, TX 75670
>Account Number: 8786890189
>Routing number: 121000248

The Parties agree this is a settlement and no representation is made that the foregoing consideration represents a reasonable royalty for the infringement alleged by Licensor.

5.      **RESERVATION OF RIGHTS**

**5.1      Reserved Rights**.  Any and all rights not explicitly granted to Licensee in Sections 2.1 and 3.1 are expressly reserved by Licensor.  No licenses to the Licensed Patents are granted by Licensor to Licensee, or any other entity, either by implication, estoppel, or otherwise, other than the licenses specifically enumerated and expressly provided in Section 2.1.

**5.2      No Sublicense Rights**.  Except as expressly provided in Sections 5.3 and 10.1, the license and releases granted to Licensee herein do not confer upon Licensee the right to grant or otherwise transfer via sublicense any rights under the Licensed Patents to any other persons or entities for any purpose.

**5.3      Sublicense to Licensee Subsidiary**.  At its sole and absolute discretion, Licensee may sublicense all or any portion of the rights set forth in paragraph 2.1 at any time, and from time to time, to any Licensee Subsidiary on such terms as it deems fit, on the conditions that (i) the rights granted under such sublicense apply to such Licensee Subsidiary only for such time as each such Licensee Subsidiary remains a Licensee Subsidiary; (ii) no such sublicense by Licensee shall be further sublicensable; and (iii) any

5

such sublicense granted by Licensee shall terminate promptly upon the termination of this Agreement or, with respect to the license granted under Section 2.1, upon termination of such license.

## 6.    REPRESENTATIONS, WARRANTIES AND COVENANTS

**6.1    Representations, Warranties and Covenants of Licensee.**  Licensee represents, warrants and covenants that: (i) execution of this Agreement by Licensee and the performance of its obligations hereunder will not violate any agreement, whether written or oral, to which Licensee is a party; (ii) Licensee has the full legal authority necessary to enter into this Agreement and perform the duties and obligations outlined herein; and (iii) neither Licensee nor any Licensee Subsidiary shall contest or assist in the contest in any forum, including the Federal Courts, whether under 28 U.S.C. §§ 2201 – 2202 or not, the United States Patent and Trademark Office, and/or the International Trade Commission, that the Licensed Patents are invalid or unenforceable; provided, however, this covenant shall not apply in the event that Licensor seeks to hold any Licensee or any Licensee Subsidiary liable for infringement of the Licensed Patents.

**6.2    Representations, Warranties and Covenants of Licensor.**  Licensor represents, warrants and covenants that: (i) it has full authority to execute and deliver this Agreement and to consummate the transactions contemplated hereby; (ii) it holds the entire rights, title, and interest necessary to grant the license to the Licensed Patents and has not transferred or assigned any rights to bring any claim for patent infringement, against Licensee or any Licensee Subsidiary for damages, or otherwise under the Licensed Patents to any third-party; (iii) the execution of this Agreement by Licensor and the performance of its obligations hereunder will not violate any agreement, whether written or oral, to which Licensor is a party; and (iv) Licensor represents and warrant that it has not assigned or transferred any interest in any claim released hereunder.

**6.3    No Further Representations or Warranties.**  EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS SECTION 6, LICENSOR MAKES NO REPRESENTATIONS OR WARRANTIES TO LICENSEE OF ANY KIND, EITHER EXPRESS OR IMPLIED, WITH REGARD TO THE VALIDITY OR ENFORCEABILITY OF THE LICENSED PATENTS AND ASSUMES NO RESPONSIBILITIES WHATSOEVER WITH RESPECT TO THE USE OR OTHER DISPOSITION

BY LICENSEE, A LICENSEE SUBSIDIARY, OR THIRD-PARTIES ACCESSING LICENSEE'S OR A LICENSEE SUBSIDIARY'S WEBSITE FOR THE LICENSED USES OF THE LICENSED PATENTS UNDER THIS AGREEMENT. IN ADDITION, LICENSOR MAKES NO REPRESENTATION THAT USE OF THE LICENSED PATENTS WILL NOT INFRINGE, DIRECTLY, CONTRIBUTORILY, OR BY INDUCEMENT, ANY PATENT, COPYRIGHT, TRADEMARK OR OTHER PROPRIETARY RIGHT OF ANY THIRD PARTY.

## 7.   LIMITATION OF LIABILITY

**7.1   Limitation of Liability.** EXCEPT IN THE EVENT OF FRAUD, LICENSOR'S TOTAL LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED THE PAYMENT SET FORTH IN SECTION 4.1 OF THIS AGREEMENT THAT IS ACTUALLY PAID AND RECEIVED BY LICENSOR. LICENSEE'S TOTAL LIABILITY UNDER THIS AGREEMENT SHALL NOT EXCEED THE PAYMENT SET FORTH IN SECTION 4.1 OF THIS AGREEMENT.   THE PARTIES ACKNOWLEDGE THAT THESE LIMITATIONS ON POTENTIAL LIABILITIES WERE AN ESSENTIAL ELEMENT IN SETTING CONSIDERATION UNDER THIS AGREEMENT.

**7.2   Limitation on Consequential Damages.** NEITHER PARTY SHALL HAVE ANY OBLIGATION OR LIABILITY (WHETHER IN CONTRACT, WARRANTY, TORT (INCLUDING PASSIVE OR IMPUTED NEGLIGENCE AND STRICT LIABILITY) OR OTHERWISE), FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LOSS OF REVENUE, PROFIT, SAVINGS, OR BUSINESS ARISING FROM OR OTHERWISE RELATED TO THIS AGREEMENT, EVEN IF A PARTY OR ITS EMPLOYEES HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.

## 8.   CONFIDENTIALITY

**8.1.**   The terms of this Agreement (but not the existence of the Agreement) shall be regarded as "***Confidential Information.***"  The Parties agree that they shall not disclose any Confidential Information without prior written consent of the other Party; provided, however, that each Party may disclose Confidential Information to such Party's fiduciary professionals, including its auditors, accountants, and attorneys, without prior written consent, and each such disclosing Party shall ensure that the Confidential Information remains confidential in accordance with this Section 8 with such fiduciary professionals;

provided further that either Party may disclose this Agreement and its terms to lawyers and retained expert witnesses in any litigation in which that Party becomes involved for use subject to any pending Protective Order after providing written notice to the other Party of that disclosure, but without requiring prior consent from that other Party.

8.2     Confidential Information shall not include information that: (i) is or at any time becomes publicly available through no fault of the receiving Party, its employees, consultants, or agents; (ii) is received without restriction from a third party lawfully in possession of such information and lawfully empowered to disclose such information; (iii) was rightfully in the possession of the receiving Party without restriction prior to its disclosure by the disclosing Party; (iv) was independently developed by employees, consultants, or agents of the receiving Party without access to such Confidential Information; or (v) is required to be disclosed pursuant to the order or requirement of a court, administrative agency, or other governmental body; provided, however, that the receiving Party provide prompt notice of such court order or requirement to the disclosing Party to enable the disclosing Party, at its sole expense, to seek a protective order or otherwise prevent or restrict such disclosure and that the receiving Party only discloses such information as is necessary to comply with such order or requirement.

9.     **TERM**

This Agreement shall commence as of the Effective Date, after execution of this Agreement by all Parties, and shall continue until six years after the expiration of the last-to-expire Licensed Patent or the expiration of any cause of action arising out of or related to the Licensed Patents, which is later, unless earlier terminated as allowed by this Agreement.

10.    **ASSIGNMENT**

**10.1.  Assignment by Licensee.**  Neither this Agreement, nor any rights or obligations hereunder, may be assigned, encumbered, or otherwise transferred by Licensee, except as expressly allowed herein.  Licensee may assign any or all of its rights or delegate any or all of its duties under this Agreement if Licensee desires to assign Licensee's rights

under this Agreement to a purchaser of all or substantially all of the assets of the Licensee by either acquisition, merger, or other transfer.

**10.2    Assignment by Licensor**.  Licensor may sell, assign, or otherwise transfer this Agreement, the Licensed Patents, or any rights hereunder, provided that: (i) Licensor provides such third party with prior notice of the existence of this Agreement; and (ii) such third party agrees to be bound by the terms and conditions, including all licenses, releases, and covenants set forth in this Agreement. IF SUCH THIRD PARTY DOES NOT AGREE TO BE BOUND BY ALL OF THE TERMS AND CONDITIONS OF THIS AGREEMENT, THEN SUCH ASSIGNMENT OR TRANSFER SHALL BE NULL AND VOID.

## 11. MISCELLANEOUS

**11.1    No Agency**.  Nothing in this Agreement is intended or shall be deemed to constitute a partnership, agency, employer-employee, or joint venture relationship between the Parties. Neither Party assumes any liability of or has any authority to bind, or control the activities of, the other.

**11.2    Entire Agreement, Amendments, and Waivers**.  This Agreement constitutes and contains the entire agreement between the Parties, and supersedes any and all prior negotiations, conversations, correspondence, understandings, and letters respecting the subject matter hereof. The section headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.  This Agreement may only be amended or modified by written document that is signed by both Parties.  Failure by either Party to enforce any term of this Agreement shall not be deemed a waiver of future enforcement of that or any other term in this Agreement or any other agreement that may be in place between the Parties.

**11.3    Severability**. If any provision of this Agreement is found to be invalid or unenforceable, then the remainder of this Agreement shall have full force and effect, and as to the invalid provision the Parties shall attempt in good faith to negotiate a substitute for any such provision, which shall most nearly approximate the intent of the Parties in entering into this Agreement.

**11.4   Compliance With Laws.** Notwithstanding anything contained in this Agreement to the contrary, the obligations of the Parties shall be subject to all laws, present and future, of any government having jurisdiction over the Parties and this transaction, and to orders, regulations, directions or requests of any such government.

**11.5   Counterparts; Electronic Signatures.** This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which together constitute one and the same instrument. Each Party shall execute and deliver to the other Parties a copy of this Agreement bearing its original signature. Prior to such execution and delivery, in order to expedite the process of entering into this Agreement, the Parties acknowledge that copies of this Agreement transmitted via email of a .pdf file, photocopy, facsimile or other process of complete and accurate reproduction and transmission shall be deemed original documents.

　　　　In witness whereof, the Parties have executed this Patent License Agreement as of the Effective Date.

LICENSOR:                                LICENSEE:

**Webvention LLC**                       **NAME OF LICENSEE,**

By:_____              By:_____

Name:_____              Name:_____

Title:_____              Title:_____

Date:_____              Date:_____

10